UNITED STATES OF AMERICA )
)
)
v. )       No. 1:10cr265
)
SAMIR IBISEVIC, )
Defendant. )

## MEMORANDUM OPINION

Following a three day trial, a jury convicted defendant of all counts of a three-count indictment charging him with (i) bulk cash smuggling in violation of 31 U.S.C. § 5332; (ii) failing to file a currency transportation report in violation of 31 U.S.C. § 5324; and (iii) making a false statement in violation of 18 U.S.C. § 1001. Defendant now seeks a new trial pursuant to Rule 33, Fed. R. Crim. P, on three grounds: (i) prosecutorial misconduct, (ii) erroneous exclusion of testimony; and (iii) violation of his right to an impartial jury. For the reasons that follow, none of these grounds warrant a new trial, and hence defendant's motion must be denied.

### I.

On Friday, June 18, 2010, defendant, Samir Ibisevic traveling with his mother, attempted to a board flight at Dulles International Airport ("Dulles") to Vienna, Austria, with final service to Sarajevo, Bosnia, carrying approximately $40,000 in concealed United States currency. The transportation of such a large amount of currency outside the country is not itself a crime, nor must one pay a tax or penalty when removing cash from the United States. The law merely requires that when leaving the country with more than $10,000 in currency,[1] one must first

---

[1] Although for simplicity this Memorandum Opinion refers only to "currency," the statute covers currency and "other monetary instruments" totaling over $10,000. 31 U.S.C. § 5332. Defendant in this case was transporting only currency, *i.e.*, United States bills.

disclose that fact by filing a Report of International Transportation of Currency or Monetary Instrument. *See* 31 U.S.C. § 5316. The failure to abide by the filing requirement, with knowledge that a filing is required, is a felony punishable by up to five years in prison as well as criminal and civil forfeiture. *See* 31 U.S.C. § 5332.

To curb the unreported transportation of bulk amounts of cash from the United States, law enforcement agents from United States Customs and Border Protection ("CBP"), often in concert with other law enforcement officers, conduct random outbound currency interdiction operations under the code name "Operation Buck Stop."[2] These operations, typically conducted at international ports of exit like Dulles, proceed by selecting an outbound international flight at random and questioning individuals on that flight about what currency they may be carrying. Because knowledge of the reporting requirement is an element of the § 5332 violation,[3] officers first inform a given passenger of the statutory disclosure requirement before asking whether the passenger is transporting more $10,000 in currency. If the passenger answers affirmatively, the appropriate disclosure form[4] is provided for the passenger to fill out and sign, after which the passenger is free to board the flight with the money. These operations comprise but one category

---

[2] Tr. 9/23/10, at 7:1-2, 32:6-12.

[3] *See* 31 U.S.C. § 5332(a)(1).

[4] This form is the Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") Form 105. The one-page form requires only basic personal information, such as contact information, citizenship or immigration classification, and the amount of currency being transported. The form does not require an explanation as to the source or purpose of the currency. *See* FinCEN Form 105, available at *http://www.fincen.gov/forms/files/fin105_cmir.pdf* (last visited December 17, 2010). During the events in question, defendant was not actually shown this form because when asked, he denied that he was carrying more than $10,000 in currency. Although the form was described to the jury, it was not admitted into evidence.

of outbound inspection operations conducted regularly by CBP, with others targeting, for example, drug smugglers or individuals with outstanding arrest warrants.[5]

At trial, the government presented five witnesses: (i) CBP Officer Andres Zayas, (ii) CBP Officer Steven Rodeheaver, (iii) Immigration and Customs Enforcement ("ICE") Special Agent Julie Hilario, (iv) Rahima Ibisevic, and (v) Chris Lowman. Defendant presented four witnesses: (i) Safet Garibovic, (ii) Fatima Velic, and (iii) Robert Schaffer. Defendant also testified on his own behalf.

The trial record reflects that defendant, a United States citizen of Bosnian descent, was in the process of boarding his flight for eventual service to Sarajevo when CBP began one of its currency interdiction operations.[6] Defendant was traveling with his mother for the purpose of attending his father's funeral in Bosnia. The interdiction operation took place in the corridor, which is essentially a hallway located behind the gate desk where passengers present their tickets for final boarding and the jetway itself. As defendant and his mother walked down the corridor, CBP Officer Andres Zayas began asking defendant a series of questions.

Officer Zayas testified at trial that he first asked defendant a series of preliminary questions, such as defendant's occupation and the purpose of his trip. After answering these questions, defendant was asked, "How much money are you traveling with today?"[7] Officer Zayas explained to defendant that it is not illegal to carry more than $10,000 out of the country. He even pointed out to defendant that "[y]ou can take a million dollars out the country, whatever

---

[5] Tr. 9/22/10, at 150:2-11.

[6] Tr. 9/23/10, at 49:8-11.

[7] Tr. 9/22/10, at 159:8-160:21.

3

money you want," but that if it is more than $10,000, "you have to fill out a form."[8] Officer Zayas also explained that defendant's answer should include the money defendant was carrying on his person and in his luggage as well as any money his mother was carrying.[9] After explaining all of this, Officer Zayas again asked defendant how much money he and his mother combined were carrying. Defendant then answered, "$5,000."[10] To confirm this answer, Officer Zayas then walked defendant over to a more private area with his luggage and asked how much money defendant and his mother were carrying "together" and "as a whole," gesturing to indicate that his question referred to all of defendant's and his mother's bags.[11] Again, defendant answered, "$5,000."[12] Defendant was then given a Customs and Border Patrol ("CBP") Form 503 to read, which stated:

> It is legal to transport any amount of currency or other monetary instrument into or out of the United States. However, if you transport, attempt to transport, or cause to be transported, including by mail or other means, currency or other monetary instrument in aggregate of amount, in aggregate amount exceeding $10,000 or its foreign equivalent at one time from the United States to any foreign place, or into the United States from any, from any foreign place, you must file a report with US Customs and Border Protection . . . .[13]

---

[8] *Id.* at 159:10-17.

[9] *Id.* at 160:9-23. Defendant does not dispute that his currency reporting obligation extended to the currency in his mother's possession. Indeed, his mother testified at trial that the money found in her bags was placed there at her son's request. Tr. 9/23/10, at 45:4-5.

[10] Tr. 9/22/10, at 161:1-4.

[11] *Id.* at 161:5-17.

[12] *Id.*

[13] *Id.* at 164:25-165:11.

4

Defendant spent one to two minutes reading the form, and at no time did he ask for a Bosnian language interpreter or a Bosnian translation of the form.[14] Defendant was then told, "If you understand [the form], then write down the amount that you have and sign it." [15] Consistent with his earlier repeated assertions, defendant wrote "5,000" and signed his name.[16] Officer Zayas then asked defendant, "Is that the correct amount? Is that all you have?" Defendant answered, "Yes."[17]

In all, defendant asserted at least four times—three times orally and once in writing—that he and his mother together were carrying only $5,000 in currency. Despite the fact that English is defendant's second language, a fact heavily relied upon by defendant at trial, Officer Zayas testified based on his rational perceptions that defendant had no trouble comprehending the questions put to him or answering the questions in English.[18] Defendant responded to each question without hesitation, never asked Officer Zayas to repeat a question, and never requested a Bosnian language interpreter.[19] Another officer, CBP Officer Steven Rodeheaver, stood within three or four feet of defendant when the questioning took place, and Officer Rodeheaver

---

[14] *Id.* at 166:24-167:25.

[15] *Id.* at 167:20-21.

[16] *Id.* at 166:24-167:25. Because defendant indicated he was not transporting more than $10,000 in currency, there was not need for him to fill out, and he was not provided, the FinCEN Form 105. *Id.* at 166:2-22.

[17] *Id.* at 169:6-8.

[18] *Id.* at 160:6-8. At trial, defendant relied heavily on the fact that although Officer Zayas speaks English fluently, he maintains a mild Puerto Rican accent. Officer Zayas testified at trial that he grew up in Puerto Rico but went to college in the continental United States, where he has remained for about fifteen years. *Id.* at 175:18-176:2.

[19] *Id.* at 159:22-25, 160:1-5, 167:12-13.

corroborated this account.[20]  Specifically, Officer Rodeheaver testified that Officer Zayas clearly

asked defendant several times how much money he and his mother were carrying in all,

including money in their luggage, and defendant answered that they were carrying $5,000.

Officer Rodeheaver also concurred that defendant appeared to understand fully the questions and

to have no difficulty communicating with Officer Zayas in English.[21]

The trial record reflects that once Officer Zayas concluded his questioning of the

defendant, he and Officer Rodeheaver proceeded to search defendant and his belongings for

currency.  In aid of this effort, Officer Zayas asked defendant, "Where is the money?"[22]

Defendant responded by pulling out his wallet and showing money from the wallet to the

officer.[23]  Officer Zayas then asked, "Is there any other money in the bags?"[24]  Defendant

responded, "No."[25]  The officers proceeded to search defendant's sole carry-on bag, a roller bag,

and found no additional currency.  Meanwhile, Officer Rodeheaver searched the bags belonging

to defendant's mother.  Both officers conducted their searches just inches apart, with all bags

together on a single table.[26]  Officer Rodeheaver first searched a camera bag that defendant's

mother had been carrying, and inside, he felt a piece of cloth that seemed to be covering

---

[20] *Id.* at 7:16-9:25.

[21] *Id.*

[22] *Id.* at 169:13-17.

[23] *Id.*

[24] *Id.* at 169:18-20.

[25] *Id.*

[26] *Id.* at 170:8-24.

something bulky.  He removed the cloth and discovered an envelope containing currency.[27]  A search of the mother's garment bag also revealed an envelope containing currency.[28]  Officer Rodeheaver then searched the mother's purse, and upon feeling each compartment, he felt an area of bulk that he could not access through any of the pockets or zippers.  He asked defendant what was in the hidden compartment and how to access it, and defendant responded, "She sewed it in there."[29]  Officer Rodeheaver then asked, "How much currency are you traveling with?  How much are we going to find?"  Defendant appeared "flustered" and finally answered, "There is 10,000 in the camera bag, 25,000 in the purse, and I have 5,000 on me."[30]  In all, the search of defendant's person, his bags, and his mother's bags revealed a total of $40,081 in currency.

After the search was completed, defendant was interviewed in an office in the main terminal by ICE Special Agent Julie Hilario.  Special Agent Hilario testified that at the beginning of the interview, she informed defendant of his Miranda rights both orally and in writing—in English—and defendant signed a waiver indicating that he understood his Miranda rights and agreed to be interviewed.[31]  According to Special Agent Hilario, the interview lasted approximately forty-five minutes, was conducted entirely in English, and at no time did defendant request a language interpreter.  Moreover, Special Agent Hilario testified that defendant appeared to have no difficulty understanding her questions or communicating his

---

[27] Tr. 9/23/10 at 11:14-13:14.

[28] *Id.* at 14:2-7.

[29] *Id.* at 15:13-17:8.

[30] *Id.* at 17:15-22.

[31] *Id.* at 97:25-98:8.

answers in English[32] Defendant admitted that all of the money, even the money found in his mother's bags, belonged to him, but he did not explain why he had kept the money hidden.[33]

The government also called defendant's mother, Rahima Ibisevic, to testify pursuant to an immunity order. Rahima Ibisevic testified, through an interpreter, that she was aware of the money hidden in the bags, and indeed she assisted in hiding the money.[34] She also testified that all of the money belonged to her son.[35] On cross examination, counsel for defendant attempted to elicit testimony that she asked her son what the officer wanted just after defendant signed the CBP Form 503. According to a proffer by defendant's counsel, the mother was prepared to testify that defendant told her, "They are asking me how much the checked luggage cost [sic] if it's lost."[36] The government objected to this statement on hearsay grounds before it was disclosed to the jury, and after a brief bench conference, the objection was sustained, excluding the statement.

The jury also heard testimony from Chris Lowman, a human resources senior manager at the ConMed Corporation, a manufacturer of medical devices and defendant's employer from approximately 2005 to 2008.[37] Lowman confirmed that defendant worked as a product assembler during his tenure at ConMed. Lowman also authenticated a number of exhibits relevant to defendant's English comprehension, including (i) defendant's resume indicating he

---

[32] *Id.* at 98:9-23.

[33] *Id.* at 98:24-99:10.

[34] *Id.* at 43:19-46:17.

[35] *Id.* at 45:4-5.

[36] *Id.* at 52:13-53:2.

[37] *Id.* at 75:1-4, 81:20-22.

spoke Bosnian and English, (ii) defendant's employment application where defendant indicated that he was "[p]roficien[t] to speak, read, or write" Bosnian and English, (iii) an employment information sheet on which defendant indicated he did not need an English translator for either spoken or written English.[38] Defendant was hired as an assembler on a particular ConMed product line, a job that required the ability to read and understand written work instructions. These instructions were given only in English, and employees were given an English proficiency test before being qualified for this position. This written test, which was admitted into evidence, contained fourteen questions, and candidates had 10 minutes to complete the test. Defendant passed the test, answering thirteen of the fourteen questions correctly within the allotted time.[39]

Defendant called several witnesses who knew him personally to testify regarding his level of English proficiency. One of these witnesses, Almir Beganovic, had been employed with defendant at Swift Transportation, where defendant was also employed as a truck driver. Like defendant, Beganovic is a United States citizen of Bosnian descent, and like defendant, English is Beganovic's second language.[40] Beganovic testified—in English—that he trained defendant as a truck driver and often had to communicate with defendant in Bosnian, rather than English, because defendant's English proficiency was not as good as his own.[41] Yet, Special Agent Hilario, who was present for Beganovic's testimony,[42] told the jury that based on interviewing

---

[38] *Id.* at 67:15-73:24.

[39] *Id.* at 75:5-80:4.

[40] Tr. 9/22/10 at 210:2-25.

[41] *Id.* at 211:3-212:4.

[42] Although witnesses were excluded from the trial pursuant to Rule 615, Fed. R. Evid., Special Agent Hilario heard Beganovic's testimony because she, as case agent, she was permitted to be present throughout the trial. Additionally, for scheduling reasons, defendant was permitted to call Beganovic between government witnesses. As such, Special Agent Hilario testified after

the defendant and watching Beganovic testify on direct and cross, defendant's proficiency was "comparable, if not better" than Beganovic's.[43] Defendant also called Safet Garibovic, a truck dispatcher who worked with defendant at Swift transportation, to testify that he communicated with defendant primarily in Bosnian rather than English because of defendant's limited English proficiency.[44] Garibovic also testified that he assisted defendant outside of work in understanding English documents, such as personal mail and bills.[45] Both Beganovic and Garibovic also testified that defendant had a positive reputation for honesty in the community.[46] Defendant called his sister, Fatima Velic, who testified—through a Bosnian interpreter—that her brother's English was not as proficient as her own.[47] Velic also testified that she gave her brother $10,000 to take with him to Bosnia for her father's funeral, although she did not explain the purpose of the money.[48]

Defendant also called Robert Schaffer, a retired teacher who helped teach defendant English. Defendant attended Schaffer's English classes for approximately three months beginning in 2000.[49] Schaffer could not recall how many times defendant attended the classes after 2000, but Schaffer did remember that defendant attended one of Schaffer's classes one

---

Beganovic even though Beganovic testified for the defense.

[43] Tr. 9/23/10 at 101:10-102:8.

[44] Id. at 122:6-126:6.

[45] Id. at 126:7-13.

[46] Tr. 9/22/10 at 212:23-213:7; Tr. 9/23/10 at 126:14-127:3.

[47] Tr. 9/23/10 at 140:19-24.

[48] Id. at 141:2-141:24.

[49] Defendant later testified at trial that Schaffer was mistaken insofar as defendant did not come to the United States until August 2001, and only after his arrival did he begin taking English

week before the trial. In addition to talking to defendant in his classes, Schaffer frequently saw defendant socially, noting that defendant's mother even cooked Schaffer dinner at her home. On some occasions, defendant had asked Schaffer for assistance in reviewing English documents, including an application to buy a home through a government program.[50] Schaffer provided the jury examples of defendant's difficulties speaking and understanding English and characterized defendant as not being able to "hold certain language concepts in his head readily," even suggesting defendant's difficulty with English was so severe as to amount to a "neurological defect" in Schaffer's lay opinion.[51] In sum, Schaffer described defendant's English proficiency as "poor."[52] He further stated that in his opinion, over the years defendant was "losing language rather than gaining language."[53]

Defendant, through a qualified Bosnian interpreter, testified on his own behalf. He explained that he thought Officer Zayas's questions in the airport corridor concerned the value of his luggage in the event the bags were lost, not how much currency he was carrying.[54] Defendant also described, without objection, the conversation with his mother that had been excluded earlier in the trial. Thus, defendant recounted that when his mother asked what the officers wanted to know, defendant told her they were asking about the value of his luggage.[55]

---

classes with Schaffer. *Id.* at 173:6-15.

[50] *Id.* at 152:5-21.

[51] *Id.* at 160:1-10.

[52] *Id.* at 152:22-24.

[53] *Id.*

[54] *Id.* at 178:9-21.

[55] *Id.* at 179:17-25. In this regard, it must be noted that although defendant's mother was not permitted to testify that defendant made this statement, the statement was eventually disclosed to

He asserted that he did not know about the currency reporting requirement, even after the officers attempted to explain it, and that he never did—and still did not on the day of trial—understand the English word "currency."[56] Only when the officers opened up his wallet and began to pull out the cash did defendant say he realized they were interested in the amount of money he was carrying, and he then immediately told the officers he was carrying $40,000.[57]

On the morning of the third day of trial, the jury commenced deliberations. Defendant cites two events that occurred during jury deliberations in his motion for a new trial. First, approximately two hours after the jury began deliberations, the jury submitted a note asking for "a legal definition of 'reasonable doubt.'"[58] Based on the Fourth Circuit's "discourag[ing] further definition of the reasonable doubt standard," the jury was essentially provided the identical instruction on reasonable doubt it had already been provided prior to deliberations. *See United States v. Walton*, 207 F.3d 694, 699 (4th Cir. 2000) ("While we discourage further definition of the reasonable doubt standard, we continue to leave the final decision of whether to acquiesce to a jury's request and define reasonable doubt to the district court's discretion."); *see also United States v. Velazquez*, 847 F.2d 140, 143 (4th Cir. 1988) ("The most likely outcome of attempts to define reasonable doubt is unnecessary confusion and a constitutionally impermissible lessening of the required standard of proof."). Accordingly, in response to its note, the jury was instructed that:

---

the jury through the defendant's testimony. Thus, the only practical effect of the exclusion of the statement during defendant's mother's testimony was the corroborating value, if any, of the mother stating that her son had indeed described the incident in those words to her at the time of the officers' questioning.

[56] *Id.* at 174:18-21, 182:10-18, 184:7-8.

[57] *Id.* at 181:3-8.

[58] Tr. 9/24/10 at 72:6-8.

The government does not have to prove each of those elements of the defendant's guilt beyond all possible doubt. The test is one of reasonable doubt. So, if you have a doubt that is reasonable as to any of the elements of a charge against the defendant, then you must acquit the defendant of that charge.[59]

Second, an internet search conducted by defendant or his counsel during jury deliberations raised the possibility that the foreperson—who was the signatory of the jury's note concerning a request for a definition of reasonable doubt—previously worked with CBP. Voir dire in the course of jury selection already ensured that no juror, including the juror ultimately selected as foreperson, knew or had any social or business relationship with any witnesses in this case, including Special Agent Hilario, Officer Zayas, or Officer Rodeheaver. Nor was any juror impaneled who had any pre-existing knowledge of the events surrounding defendant's criminal charges. Nevertheless, under the circumstances, and with the agreement of both parties, the foreperson was further questioned by the Court outside the presence of the other jurors to confirm that the foreperson was capable of rendering a fair and impartial verdict. In response to questions, the foreperson explained that he had in fact worked for CBP—not as a law enforcement officer—but as an administrator, where he was in charge of setting up the "Customs and Border situation room."[60] He further elaborated that:

> I was in charge of the situation room, which meant that I was passing information, basically, gathered information and passed it to our chain of command, and paraphrase the Customs and Border sessions. But I wasn't a law enforcement officer and had no law enforcement responsibilities.[61]

The foreperson served in this position from 2005 to 2009, and he left CBP well before the defendant attempted to board his flight with more than $40,000 in currency. When asked if he

---

[59] *Id.* at 79:17-22.

[60] *Id.* at 82:19-22.

[61] *Id.* at 83:4-9.

felt any of his duties and responsibilities in that capacity, or any of his experiences, would

prevent or hinder him in any way from rendering a fair and impartial verdict in this case, he

answered, without equivocation or hesitation, "Not at all, sir."[62]  After this questioning,

defendant's counsel stated, "I don't have any grounds to ask the Court to recuse the juror."[63]

Because the foreperson's answers to the questions made clear that he was able to render a fair

and impartial verdict, and without objection from the defendant, the foreperson was allowed to

remain on the jury and to continue deliberations.

After approximately four hours of deliberations, the jury returned a unanimous verdict

finding defendant guilty on all counts.  Defendant has not yet been sentenced.

## II.

A new trial may be granted pursuant to Rule 33, Fed. R. Crim. P. "if the interest of justice

so requires."  The meaning of the phrase in "the interest of justice" in the context of Rule 33 is

not difficult to discern; the phrase's plain meaning makes unmistakably clear that granting a new

trial is discretionary,[64] and the cases reflect that this discretion should be exercised where it is

demonstrated that the fundamental fairness or integrity of the trial result is substantially in

doubt.[65]  For example, a new trial may be appropriately granted in the "interest of justice" where

the conviction resulted from perjured testimony, nondisclosure of exculpatory material evidence,

---

[62] *Id.* at 83:10-14.

[63] *Id.* at 83:22-23.

[64] *See* Rule 33, Fed. R. Crim. P. (noting that "the court may vacate any judgment and grant a new trial if the interest of justice so requires") (emphasis added); *see also United States v. Campbell,* 977 F.2d 854, 860 (4th Cir. 1992) (recognizing the trial court's discretion to grant a Rule 33 motion for a new trial).

[65] *See* cases cited *supra* note 66; *see also United States v. Jennings,* 438 F. Supp. 2d 637, 642 (E.D. Va. 2006), *aff'd,* 496 F.3d 344 (4th Cir. 2007).

or exertion of improper influence on the jury.[66] It is well-settled that new trial motions under Rule 33 should be granted "sparingly," as "a jury verdict is not to be overturned except in the rare circumstance when the evidence weighs heavily against it." *United States v. Wilson*, 624 F.3d 640 (4th Cir. 2010) (quoting *United States v. Smith*, 451 F.3d 209, 217 (4th Cir. 2006)) (internal quotations omitted). It is through the lens of these principles that defendant's new trial motion must be examined.

## III.

Defendant argues for a new trial on three grounds: (i) that counsel for government misstated facts and expressed a personal view on a witness's credibility in closing argument; (ii) that evidence essential to the defense—namely the defendant's hearsay statements excluded during his mother's hearsay testimony—was inappropriately excluded at trial; and (iii) that defendant's right to an impartial jury was violated by the inclusion of the foreperson in light of the foreperson's prior work with CBP. None of these arguments justify a new trial.

### A.    Prosecutorial Misconduct

In his first argument for a new trial, defendant alleges prosecutorial misconduct in the government's closing rebuttal argument. Specifically, defendant argues that the government mischaracterized the testimony of defendant's former English teacher, Robert Schaffer, and then expressed a personal view of the weight that should be afforded such testimony.

---

[66] *See generally* 3 Wright & Miller FEDERAL PRACTICE AND PROCEDURE §§ 553-556 (discussing new trial motions in variety of contexts); *compare United States v. Gonzalez-Gonzalez*, 258 F.3d 16, 20 (1st Cir. 2001) (in Rule 33 motion based on newly discovered evidence, interest of justice requires new trial only if, *inter alia*, such evidence would probably lead to acquittal) *with U.S. v. Bruscino*, 662 F.2d 450 (7th Cir. 1981) (in new trial motion based on jury's consideration of extraneous evidence, interest of justice requires new trial if reasonable possibility exists that jury was prejudiced as a result).

It is well settled that "[i]mproper remarks during closing argument do not always mandate retrial." *United States v. Higgs*, 353 F.3d 281, 330 (4th Cir. 2003). Rather, to warrant a new trial, the prosecutor's remarks must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (citations omitted). To make this determination, the trial court should consider first, whether the remarks were in fact improper, and second, whether the remarks prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial. *See United States v. Adam*, 70 F.3d 776, 780 (4th Cir. 1995) (citing *United States v. Mitchell*, 1 F.3d 235, 241 (4th Cir. 1993)). With regard to the second prong, the question whether the prejudice was sufficient to grant a new trial "must be gauged from the facts of each trial." *Id.* Six factors govern this analysis:

> (1) the degree to which the remarks tended to mislead the jury or prejudice the accused; (2) whether the remarks were isolated or extensive; (3) the strength of the evidence supporting guilt in the absence of the remarks; (4) whether the comments were deliberately placed in front of the jury to divert attention to extraneous matters; (5) whether the remarks were invited by improper conduct of defense counsel; and (6) whether curative instructions were given to the jury.

*United States v. Jones*, 471 F.3d 535, 542, n.2 (4th Cir. 2006) (citing *United States v. Wilson*, 135 F.3d 291, 299 (4th Cir. 1998)). And importantly, "[a] new trial for prosecutorial misconduct is a remedy reserved for the most egregious case." *United States v. Cabrera*, 1992 U.S. App. LEXIS 594, at *4 (4th Cir. Jan. 21, 1992) (citing *United States v. Dudley*, 941 F.2d 260 (4th Cir. 1991)).

Defendant's argument concerning prosecutorial misconduct focuses on the following portion of the government's closing rebuttal argument:

> [ATTORNEY FAIRFAX:] Mr. Kamens also asked you to remember what the 85-year-old English teacher said, that the defendant loses language and can't comprehend certain things. I would also ask you to remember and keep in mind that the defendant, Mr. Ibisevic, has not seen that teacher since 2001. He testified he saw him for three months about ten years ago, and then saw him again about a

week or two ago, and talked to him about the case, talked to him about the charges—

ATTORNEY KAMENS: We object. That's inconsistent with the testimony.

THE COURT: Well, it's up to the jury to decide what the testimony was. So your objection is overruled. But it's the jury's determination, what the testimony was.

ATTORNEY FAIRFAX: Thank you, your Honor.

THE COURT: Your next argument. Let's proceed.

ATTORNEY FAIRFAX: Thank you, your Honor. The 85-year-old teacher testified about Mr. Ibisevic's English capability, saying he loses language. He has not seen him in almost ten years. How much credibility, how much weight do you give to that? I wouldn't give much.[67]

Schaffer's testimony centered on defendant's level of English proficiency, which, as defendant correctly notes, was a sharply-contested issue at trial. Indeed, at trial defendant did not dispute that he carried more than $10,000 in currency between him and his mother and that he failed to disclose this fact to Officer Zayas orally or in writing using the appropriate CBP forms. Instead, defendant argued only that he lacked sufficient proficiency in English to understand Officer Zayas's questions. Had he understood the questions and nonetheless answered as he did, defendant clearly would have possessed the requisite *mens rea* to render him guilty of all three counts charged in the indictment. *See* 31 U.S.C. § 5332 (elements of bulk cash smuggling); 31 U.S.C. § 5324 (elements of failing to file a currency transportation report); 18 U.S.C. § 1001 (elements of making a false statement). Accordingly, defendant called Schaffer to testify concerning defendant's English proficiency both as defendant's English teacher and as a friend of defendant and his family. In this regard, Schaffer testified that after defendant stopped attending his classes regularly in 2000 or 2001, Schaffer could only recall seeing defendant in his

---

[67] Tr. 9/24/10 at 33:9-34:7.

English class one time—the week before defendant's trial. Schaffer also recalled seeing defendant outside of class on numerous occasions, including eating dinner at defendant's home.

Based on this record, defendant takes exception to the government's statement in closing argument that until a week before trial, Schaffer had not seen the defendant since 2001. In response, the government contends that its summary of Schaffer's testimony was accurate because counsel was referring to defendant's level of interaction with Schaffer in a teaching capacity, not social meetings. But the government's remarks in closing included no such limiting language, and it would be reasonable for jurors to think counsel for the government was asserting that Schaffer and defendant had essentially no interaction for approximately nine years. In this limited respect, therefore, the prosecutor's remarks arguably did not accurately reflect the trial testimony.

Nevertheless, in consideration of each of the six factors articulated in *Jones*, the mischaracterization of Schaffer's testimony did not sufficiently prejudice defendant so as to warrant a new trial. First, the mischaracterization, if any, was slight given that Schaffer testified his interactions with defendant had indeed been limited since defendant stopped taking Schaffer's classes regularly in 2000 or 2001. Additionally, defendant's counsel timely objected to the statements in the presence of the jury, prompting the Court to remind the jurors that their recollection of the evidence—not the recollections of the attorneys—must control their deliberations. This instruction effectively neutralized the practical impact of the prosecutor's mischaracterization on the jurors' deliberations. Second, the government's remarks were isolated, not extensive. Indeed, the quoted selection of the government's closing rebuttal argument cited above was the only reference to Schaffer's relationship with defendant in the government's complete closing argument. Third, as to the strength of the evidence in the

18

absence of the prosecutor's remarks, it is fair to note that the evidence of guilt in this case is unquestionably strong. The government's witnesses, particularly Officer Zayas, Officer Rodeheaver, and Special Agent Hilario, testified at length regarding defendant's English proficiency on the day of the currency interdiction. And unlike Schaffer, who merely testified to his perceptions of defendant's English comprehension generally, the law enforcement witnesses testified to defendant's ability to speak and to understand English as defendant manifested this ability in the precise context relevant to the jury's deliberations, namely the discussion of how much currency defendant was carrying. These witnesses provided consistent accounts of defendant communicating in English without difficulty for extended periods of time—forty-five minutes in Special Agent Hilario's case—concerning defendant's transportation of currency. Fourth, the government's comments were certainly not deliberately placed in front of the jury to divert attention to extraneous matters. Fifth, although the government's remarks were not invited by improper conduct of defense counsel, defendant's reliance on a witness with an admittedly hazy recollection of how often he had seen defendant over the last ten years prompted the government to remind the jury that the contact between these two men had been limited. Finally, the jurors were instructed on several occasions throughout the trial that their recollections of the trial testimony controlled their deliberations, not the recollections of counsel, and this instruction was repeated when defendant objected to the government's remarks in closing. In all, therefore, after "gaug[ing] [defendant's motion] from the facts of [this] trial" in light of the six *Jones* factors, it is clear that the government's remarks did not so prejudice defendant's substantial rights as to deprive defendant of a fair trial. *See Adam*, 70 F.3d at 780.

Defendant also argues that the government's remarks concerning Schaffer injected improper personal opinion into the trial when counsel for the government stated, "How much

19

credibility, how much weight do you give to that? I wouldn't give much."[68] It is worth noting

initially that defendant did not assert a timely objection to this statement at trial.[69] In any event,

the prosecutor's statement in this case does not warrant a new trial. In *Adam*, the Fourth Circuit

upheld the denial of a new trial motion in a case where the government's closing argument

included statements such as "I'm not asking you to like Dr. Mostaan, but I am telling you that he

is believable," and "I think [the government investigator] did an excellent job, and I hope you'll

agree with me." *Id.* at 780 n.2 (alteration in original). The prosecutor's statements in *Adam*

were substantially more offensive to the rule prohibiting counsel from expressing personal

opinions in argument than the prosecutor's statements here; yet, even the *Adam* statements were

not deemed significant enough to warrant a new trial. It follows that the same result obtains

here. Just as in *Adam*, while "[i]t might have been preferable" for the remarks not to have been

made, the language of personal opinion was used "in an innocuous, conversational sense," not in

"an attempt to replace the evidence with the prosecutor's personal judgments." *See Adam*, 70

F.3d at 780. In the circumstances, therefore, defendant's right to a fair trial was not prejudiced.

Accordingly, none of the prosecutor's statements cited by defendant in support of his allegation

of prosecutorial misconduct justify the grant of a new trial.

---

[68] Tr. 9/24/10 at 33:9-34:7.

[69] In a motion for a new trial, the interests of justice standard—not the plain error standard—
applies even where defendant does not timely object to the error at trial. *See United States v.
Sardesai*, 1997 U.S. App. LEXIS 27952, at *16 n.8 (4th Cir. Oct. 10, 1997) (noting that the trial
court has discretion to grant a new trial where the interests of justice so require even where
defendant failed to object to the error at trial) (citing *United States v. McBride*, 862 F.2d 1316
(8th Cir. 1988)); *see also United States v. Jennings*, 438 F. Supp. 2d 637, 642 (E.D. Va. 2006);
*United States v. Adebimpe Aderoju*, 2006 U.S. Dist. LEXIS 53383 (E.D. Va. Aug. 2, 2006). It is
for this reason that new trial motions must be granted sparingly; otherwise, a "perverse
incentive" would arise whereby "[a] party seeing error would be free to sit silently, hoping to
prevail in spite of the error, but nonetheless confident that if he does not prevail he can still
obtain a new trial based on the error." *Jennings*, 438 F. Supp. 2d at 642.

## B. Exclusion of Hearsay Testimony

Defendant's second basis for seeking a new trial rests on the exclusion at trial of his

mother's statement that when she asked defendant, in the corridor during questioning by Officer

Zayas, what the officers wanted, defendant responded, "They are asking me how much the

checked luggage cost [sic] if it's lost."[70] Defendant offered this statement for the purpose of

proving that defendant in fact believed the officers were asking about the value of his luggage, as

this would tend to defeat the *mens rea* requirement of all three counts charged. This statement

was excluded on the government's objection to hearsay. Defendant argues that the statement

was not hearsay based on Rule 801(c), Fed. R. Evid., and that even if the statement were hearsay,

it falls within the hearsay exception for present sense impressions under Rule 803(1), Fed. R.

Evid. The government does not respond directly to defendant's argument that the statement is

admissible under the hearsay rules, but rather points out that defendant's attempt to introduce his

own prior, out-of-court statement through his mother was calculated to "effectuate an end-run

around the adversarial process by, in effect, testifying without swearing an oath, facing cross-

examination, or being subjected to first-hand scrutiny by the jury." *United States v. McDaniel*,

398 F.3d 540, 545 (6th Cir. 2005). Yet, the language from the *McDaniel* case that the

government relies upon has no impact on the admissibility question presented here.[71] Indeed, by

not addressing defendant's argument that the statement was admissible, the government's brief

essentially concedes that the hearsay rules do not require exclusion of the mother's testimony.

---

[70] *Id.* at 52:13-53:2.

[71] In language cited by the government from *McDaniel*, the Sixth Circuit was merely noting that the hearsay exclusion for admissions by party opponents applies only to the statements of the party opponent, and not for statements introduced by the party itself. To allow otherwise, the court appropriately recognized, would allow an end-run around cross-examination and other safeguards in the adversarial system. 398 F.3d at 545.

On balance, the government's apparent concession is correct. The statement was excluded because it appeared to be offered for the truth of the matter asserted, namely that defendant actually believed the officers were asking about insurance on his luggage rather than currency. Although it is true, as defendant concedes, that he hoped the jury would infer from this statement that he actually believed he was being asked about insurance, circuit authority indicates that such an inference does not convert the underlying statement to hearsay. *See Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001) (children's statements mistakenly identifying a man in a purple reptile suit as Barney not hearsay in a trademark infringement suit). Moreover, assuming the mother's testimony as to the defendant's out-of-court statement was hearsay, the *Lyons* opinion also supports the view that the excluded testimony in this case likely falls within the exception for present sense impressions. *Id.*; *see also* Rule 803(1), Fed. R. Evid.

In any event, the government argues further and correctly that the exclusion of the testimony does not justify the grant of a new trial. It is well settled that for a nonconstitutional error such as the one alleged by defendant in excluding his mother's testimony, the appropriate test of harmlessness is "whether [one] can say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *United States v. Sanders*, 964 F.2d 295, 299 (4th Cir. 1992) (quoting *United States v. Nyman*, 649 F.2d 208, 211-12 (4th Cir. 1980)) (internal quotations and ellipsis omitted). Furthermore, one of the "decisive factors" in applying this standard is "the closeness of the case." *Id.* (quoting *Nyman*, 649 F.2d at 212) (internal quotations omitted).

In arguing the harmfulness of excluding the statement, defendant relies primarily on *United States v. Parry*, 649 F.2d 292 (5th Cir. 1981). In *Parry*, the Fifth Circuit granted a new

22

trial in a drug distribution conspiracy case where the defendant admitted he acted as a

middleman in arranging three separate drug transactions for undercover agents of the Drug

Enforcement Administration, but he argued that he knew the agents were undercover and he

thought he was assisting them in their investigation. To corroborate this story, defendant called

his mother to testify as follows:

> Scott [the defendant] received several phone calls and I would tell Scott that Bob
> called and I questioned Scott on who he was because I thought at first it was a
> painting job and Scott had said told me that his name was Bob Starratt, he was
> working with him, he was a narcotics agent, he was working with and not to
> worry.

*Id.* at 294. The government argued that the statements, even if erroneously excluded, were

cumulative of the defendant's own trial testimony, and thus the exclusion was harmless.

Reversing, the Firth Circuit not only found the statements admissible but noted that "rather than

being cumulative, the excluded testimony was the only available evidence that could corroborate

Parry's story that he had known of the agents' identities, a story the jury may have found self-

serving if not farfetched." *Id.* at 296.

The *Parry* decision is, of course, not binding in this jurisdiction, but more importantly,

the case was decided on unusual facts that are distinguishable in two respects. First, critically to

the Fifth Circuit's analysis, the statement in *Parry* was "standing alone" as the only evidence

shedding light on the critical factual dispute in the case, namely whether Parry actually believed

he was legally assisting law enforcement officers in drug transactions. *Id.* By contrast, the key

factual issue here was whether defendant was sufficiently proficient in English to understand,

when answering questions orally from Officer Zayas and in writing on the CBP Form 503, that

these questions concerned the amount of currency he was transporting. A great deal of evidence

was presented on this issue, and while the mother's testimony may have corroborated, in some

sense, defendant's assertion that he believed he was being asked about the value of his luggage,

her testimony hardly stood alone on the issue of defendant's state of mind. Indeed, the second distinction between this case and *Parry* is the closeness of the evidence in the two cases. Unlike *Parry*, the evidence in this case concerning defendant's *mens rea*—*i.e.*, whether he understood the officers' questions—was overwhelming. Officer Zayas asked defendant orally how much money he was carrying several times, provided him the CBP Form 503 with a written explanation of the disclosure requirement, and then followed up on defendant's written response with an oral confirmation of how much money defendant was carrying. Additionally, all three officers who interacted with defendant that day—Officer Zayas, Officer Rodeheaver, and Special Agent Hilario—agreed that defendant appeared to understand fully the questions put to him and communicated his answers in English without difficulty. At no time did any of them perceive that defendant did not understand their questions, nor did they feel an interpreter was necessary. Indeed, Special Agent Hilario interviewed defendant for forty-five minutes—in English—and defendant never asked, nor did Special Agent Hilario perceive any need, for an interpreter. Finally, defendant's story was, on its face, lacking credibility. Even if defendant believed that he was being asked about the value of his lost luggage, it is difficult to understand why defendant would state that his luggage was worth $5,000 given it contained over $30,000.[72] The jury would have to believe that defendant just happened to report a value for his luggage that was

---

[72] Indeed, defendant seemed to understand the figure of $5,000 for his luggage made little sense and admitted as much in his testimony:

> Q. And you thought the luggage was worth $5,000?
>
> A. I put down that number. I knew I would never be given that much money for the lost luggage, but it had happened to me before that, when we were coming back from Bosnia, our luggage didn't come with us. It took a number of days before they delivered the luggage to us. But some people whom I know never got the luggage. It was definitely lost. And they received a sum for that.

Tr. 9/23/10 at 186:17-25.

equivalent to the exact amount of currency he had on his person when he was being questioned.[73] In all, because the evidence was not close—indeed, it was overwhelming—in demonstrating that defendant understood he was being asked about the amount of currency he and his mother were carrying, the error in excluding the relevant portion of the mother's testimony, if any, cannot be said to have swayed the jury's verdict. *See Sanders*, 964 F.2d at 299 (noting that one of the "decisive factors" in determining whether "judgment was not substantially swayed by the error" is "the closeness of the case.").

Defendant repeatedly notes in his motion for a new trial that during deliberations, the jury submitted a note requesting a clarification of the meaning of reasonable doubt, as though this note demonstrates the evidence in the case was close. This conclusion is purely speculative; it is entirely appropriate for a jury to question the meaning of any legal term or instruction they do not fully understand, and the only reasonable inference warranted is that they wanted to have the term "reasonable doubt" defined. The submission of such a note, therefore, does not indicate the case was close. Indeed, the jury deliberated only four hours.

In any event, a trial judge's consideration of the evidence as a whole is the more appropriate means of evaluating the closeness of a given case. *See Arizona v. Washington*, 434 U.S. 497, 514 (1978). And in this instance, the trial record taken as a whole does not warrant a conclusion that the case was close.

---

[73] In this regard, defendant's testimony was not merely "self-serving" and "farfetched" in isolation, as in *Parry*, 649 F.2d at 296, but actually undermined by the record as a whole. This is an important distinction from *Parry*. In *Parry*, the excluded corroborating could have helped make defendant's *unlikely* defense seem *possible*—perhaps even *plausible*. But here, defendant's explanation, even taken together with his mother's corroboration, would not have tipped the scales. For the reasons already stated, the trial record fully supported the jury's verdict.

## C.    Jury Impartiality

Finally, defendant argues that his right to an impartial jury was violated by allowing the foreperson to remain on his jury after defendant learned in the course of deliberations that the foreperson previously worked with CBP. This information first came to light during deliberations, and by agreement of both parties, additional voir dire of the foreperson was conducted outside the presence of the jury. Following this questioning, defendant's counsel admitted he did not "have any grounds to ask the Court to recuse the juror."[74] Yet, defendant now proffers additional facts not raised at the time of the objection that, in his view, establish that the foreperson should not have remained on the jury. In any event, the newly proffered evidence adds little to the facts already disclosed through the foreperson's additional voir dire, and none of this information demonstrates that defendant's right to an impartial jury was violated.

The Constitution mandates that every criminal defendant is entitled to have an impartial jury deciding the facts of the case. U.S. Const. amend. VI. But as the Supreme Court has recognized, "due process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Indeed, "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote," and due process does not require a jury free of all imperfections. *Id.* Rather, due process calls for "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Id.* In determining whether a juror is biased, attention may be given to both actual bias and implied bias. Actual bias may be demonstrated where (i) "a

---

[74] *Id.* at 83:22-23.

juror failed to answer honestly a material question on voir dire," and (ii) "a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip. v. Greenwood*, 464 U.S. 548 (1984). By contrast, implied bias "is limited in application to those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial." *United States v. Fulks*, 454 F.3d 410, 432 (4th Cir. 2006). For example, implied bias might exist where a juror was a "close relative of one of the participants in the trial or the criminal transaction, or. . . somehow involved in the criminal transaction." *Id.*

Measured by these principles, defendant here has not demonstrated a basis for either actual or implied bias on the part of the jury foreperson. In addition to the facts revealed about the foreperson through the voir dire and subsequent questions put to the foreperson during deliberations, defendant offers several additional facts based on an internet investigation conducted after the trial.[75] These facts were not brought to the Court's attention until the motion for a new trial, but in any event, they do not alter the result. The additional facts may be summarized as follows:

1. The foreperson's profile on the career networking website LinkedIn indicates that he was a program manager for CBP from May 2005 until February 2006, where he worked in the "operations center that was responsible for providing [CBP] senior level management with an operational and situational awareness picture of the current threats to the peace and security of the nation and its borders." Def. Br. at 7.

---

[75] Because these facts, even if true, do not justify a finding of bias, defendant's facts—though not necessarily the inferences he draws from those facts—are accepted as true for the purpose of resolving defendant's motion.

2. As a CBP program manager, the foreperson "[s]upervised a staff of 21 Watch Officers and six Senior Watch Officers . . . assigning work through subordinate supervisors . . . and reviewing . . . Situating Room correspondence." *Id.* (ellipses in original).

3. From February 2006 until January 2007, the foreperson served as the Acting Deputy Director of the Current Operations Division for the Department of Homeland Security ("DHS"), where he "[s]upervised the performance of [ICE] and [CBP] watch officers in the National Operations Center." *Id.*

4. From January 2007 until June 2009, the foreperson worked for CBP as a program manager in the Office of Intelligence and Operations Coordination. *Id.*

5. In an effort to elaborate on the foreperson's duties on the operations side of DHS, defendant cites a DHS webpage explaining that the National Operations Center ("NOC") is divided into an operations and an intelligence side, with the senior watch officer serving on the operations side. The operations side "tracks emergency management and law enforcement activities across the country that may affect national security." *Id.* (citing Department of Homeland Security Office of Inspector General, Information Sharing at the National Operations Center (Redacted), *available at* http://www.dhs.gov/xoig/assets/mgmtrpts/OIGr_10-15_Nov09.pdf).

With respect to actual bias, it is clear that, even accepting defendant's proffered facts as true, the foreperson never demonstrated bias by failing to answer honestly a material question on voir dire. Defendant argues that the foreperson was dishonest in failing to answer in the affirmative when asked if he knew ICE Special Agent Hilario or have had "any business or

social dealings of any kind whatsoever" with her.[76]  Defendant argues that merely by virtue of the foreperson having had a senior position with DHS that ended well before defendant attempted to board an international flight with $40,000 in currency, and even despite the foreperson never having known or worked with Special Agent Hilario, he should have answered affirmatively.  This argument is meritless.  The question put to potential jurors concerning business and social dealings was designed to reveal actual business or social relationships, not tenuous, distant relationships that theoretically connect two people separated both by time and function across a large agency with a sprawling chain of command.  Additionally, as the foreperson explained when questioned further about his role at CBP during the deliberations phase of the trial, he served in an administrative role, not in a law enforcement role.[77]  Although his work in the situation room involved facilitating communications between agencies and various agency sections, ostensibly including CBP and ICE, he clearly stated, and the defendant's proffered evidence does not refute, that he served no law enforcement function.  Finally, it should be noted that the foreperson's demeanor was fully consistent with his providing complete and honest answers to the Court's questions.  Indeed, following questioning, defendant's counsel admitted, "I don't have any grounds to ask the Court to recuse the juror."[78]

---

[76] *See* Tr. 9/22/10 at 17:17-22.

[77] Defendant nevertheless asserts the foreperson held a law enforcement function based on the report from the Department of Homeland Security Office of Inspector General ("OIG"), which suggests that the "side" of NOC on which the foreperson served—the operations side—is engaged in part in "track[ing] . . . law enforcement activities."  Def. Br. at 7.  It would be patently unreasonable to infer from the OIG's generalized description of the NOC that the foreperson was engaged in law enforcement activities merely because he worked on the NOC's operations side.  Furthermore, the "tracking" of law enforcement activities is a far cry from the active law enforcement efforts in which Special Agent Hilario engaged.  In short, the defendant's attempt to link between the foreperson and Special Agent Hilario flatly fails.

[78] Tr. 9/22/10 at 83:22-23.

No significant new information has been proffered since the trial to alter this conclusion. In sum, there is no basis for a finding of actual bias by the foreperson.

Similarly, the record does not support a finding of implied bias. Defendant can hardly argue that the "extreme" circumstances required to invoke the implied bias doctrine are present here. *See Fulks*, 454 F.3d at 432. Indeed, the foreperson is not a "close relative of one of the participants in the trial or the criminal transaction, or . . . somehow involved in the criminal transaction." *Id.* The foreperson had no role in the currency interdiction operation that led to defendant's criminal charges, and as stated previously, he had no actual relationship to Special Agent Hilario, let alone a familial relationship. Moreover, the foreperson's connection to CBP and ICE ended well before the events of June 18, 2010. As such, the assertion of implied bias is meritless. Defendant has demonstrated no basis to conclude that his right to an impartial jury was violated.

## IV.

For the reasons stated, defendant's motion for a new trial must be denied.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

Alexandria, Virginia
December 29, 2010

/s/

T. S. Ellis, III
United States District Judge